# EXHIBIT "A"

# Court of Common Pleas - Civil

# Civil Docket Report

No Items in Cart Log In

A $5 Convenience fee will be added to the transaction at checkout.

< New Search

## Case Description

| | |
|---|---|
| **Case ID:** | 260702927 |
| **Case Caption:** | EVANS VS DRAFTKINGS INC. ETAL |
| **Filing Date:** | Friday , July 24th, 2026 |
| **Court:** | MAJOR JURY-COMPLEX |
| **Location:** | CITY HALL |
| **Jury:** | JURY |
| **Case Type:** | PRODUCT LIABILITY |
| **Status:** | WAITING TO LIST CASE MGMT CONF |

## Related Cases

*No related cases were found.*

## Case Event Schedule

*No case events were found.*

## Case Motions

*No case motions were found.*

## Case Parties

| Seq # | Assoc | Expn Date | Type | Name |
|---|---|---|---|---|
| 1 | | | ATTORNEY FOR PLAINTIFF | BURNE, FRANCESCA |
| **Address:** | 17 E. MAIN STREET, SUITE 200<br>PENSACOLA FL 32502<br>(850)266-2989<br>fburne@awkolaw.com | **Aliases:** | *none* | |
| | | | | |
| 2 | 1 | | PLAINTIFF | EVANS, CHRISTOPHER |
| **Address:** | 2555 WELSH RD.<br>PHILADELPHIA PA 19114 | **Aliases:** | *none* | |
| | | | | |
| 3 | 6 | | DEFENDANT | DRAFTKINGS INC |
| **Address:** | 222 BERKELEY STREET 5TH FLOOR<br>BOSTON MA 02116 | **Aliases:** | *none* | |
| | | | | |
| 4 | | | DEFENDANT | CROWN PA GAMING INC |
| **Address:** | 222 BERKELEY STREET 5TH FLOOR<br>BOSTON MA 02116 | **Aliases:** | *none* | |
| | | | | |
| 5 | | | TEAM LEADER | BRIGHT, GWENDOLYN N |
| **Address:** | 1206 STOUT CENTER FOR C.J.<br>1301 FILBERT ST.<br>PHILADELPHIA PA 19107 | **Aliases:** | *none* | |
| | | | | |
| 6 | | | ATTORNEY FOR DEFENDANT | GLAZER, MATTHEW A |
| **Address:** | COZEN OCONNOR<br>ONE LIBERTY PLACE<br>1650 MARKET STREET, SUITE 2800<br>PHILADELPHIA PA 19103<br>(215)665-5566<br>mglazer@cozen.com | **Aliases:** | *none* | |
| | | | | |
| 7 | 6 | | ATTORNEY FOR DEFENDANT | HAMILTON, DEXTER R |
| **Address:** | ONE LIBERTY PLACE<br>1650 MARKET STREET<br>SUITE 2800<br>PHILADELPHIA PA 19103<br>(215)665-2166<br>DHAMILTON@COZEN.COM | **Aliases:** | *none* | |

## Docket Entries

| Filing Date/Time | Docket Type | Filing Party | Disposition Amount |
|---|---|---|---|
| 24-JUL-2026 12:10 PM | ACTIVE CASE | | |
| **Docket Entry:** | E-Filing Number: 2607057149 | | |
| | | | |
| 24-JUL-2026 12:10 PM | COMMENCEMENT CIVIL ACTION JURY | BURNE, FRANCESCA | |
| **Documents:** | *Click link(s) to preview/purchase the documents* Final Cover | Add All to Cart | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 24-JUL-2026 12:10 PM | COMPLAINT FILED NOTICE GIVEN | BURNE, FRANCESCA | |
| **Documents:** | *Click link(s) to preview/purchase the documents* Evans v. DraftKings Inc., et al. - Civil Cover Sheet-.pdf Evans v. DraftKings Inc., et al. - COMPLAINT.pdf | Add All to Cart | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. | | |
| | | | |
| 24-JUL-2026 12:10 PM | JURY TRIAL PERFECTED | BURNE, FRANCESCA | |
| **Docket Entry:** | 12 JURORS REQUESTED. | | |
| | | | |
| 24-JUL-2026 12:10 PM | WAITING TO LIST CASE MGMT CONF | BURNE, FRANCESCA | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 04-SEP-2026 04:43 PM | ENTRY OF APPEARANCE | GLAZER, MATTHEW A | |
| **Documents:** | *Click link(s) to preview/purchase the documents* Entry of Appearance (DK Evans)-9-4-26.pdf | Add All to Cart | |
| **Docket Entry:** | ENTRY OF APPEARANCE OF DEXTER R HAMILTON AND MATTHEW A GLAZER FILED. (FILED ON BEHALF OF CROWN PA GAMING INC AND DRAFTKINGS INC) | | |

| | | | |
|---|---|---|---|
| 08-SEP-2026 11:37 AM | STIPULATION FILED | GLAZER, MATTHEW A | |
| **Documents:** | *Click link(s) to preview/purchase the documents* Evans Stipulation.pdf | Add All to Cart | |
| **Docket Entry:** | STIPULATION TO RESPONSIVE PLEADINGS SCHEDULE FILED. (FILED ON BEHALF OF CROWN PA GAMING INC AND DRAFTKINGS INC) STIPULATION APPROVED. JUDICIAL APPROVAL NOT REQUIRED AS ALL PARTIES HAVE CONSENTED. | | |

^ Go to Top

Philadelphia Courts

Questions regarding cases listed on this site can be directed to the Trial Division - Civil Administration at civiladminsupport@courts.phila.gov and (215) 686-8326 or the Office of Judicial Records - Civil at OJRCivil@courts.phila.gov and (215) 686-6652.

User Accepts/Agrees to Disclaimer.

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)
JULY 2026 02927
E-Filing Number: 2607057149

| | |
|---|---|
| PLAINTIFF'S NAME<br>CHRISTOPHER EVANS | DEFENDANT'S NAME<br>DRAFTKINGS INC. |
| PLAINTIFF'S ADDRESS<br>2555 WELSH RD.<br>PHILADELPHIA PA 19114 | DEFENDANT'S ADDRESS<br>222 BERKELEY STREET 5TH FLOOR<br>BOSTON MA 02116 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME<br>CROWN PA GAMING, INC |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>222 BERKELEY STREET 5TH FLOOR<br>BOSTON MA 02116 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 1 | 2 | ☒ Complaint ☐ Petition Action ☐ Notice of Appeal<br>☐ Writ of Summons ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☒ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☐ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

CASE TYPE AND CODE
2P - PRODUCT LIABILITY

STATUTORY BASIS FOR CAUSE OF ACTION

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | IS CASE SUBJECT TO COORDINATION ORDER? |
|---|---|
| FILED<br>PRO PROTHY<br>JUL 24 2026<br>L. BREWINGTON | YES NO |

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: CHRISTOPHER EVANS

Papers may be served at the address set forth below.

| | | |
|---|---|---|
| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY<br>FRANCESCA BURNE | | ADDRESS<br>17 E. MAIN STREET, SUITE 200<br>PENSACOLA FL 32502 |
| PHONE NUMBER<br>(850)266-2989 | FAX NUMBER<br>none entered | |
| SUPREME COURT IDENTIFICATION NO.<br>324523 | | E-MAIL ADDRESS<br>fburne@awkolaw.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY<br>*FRANCESCA BURNE* | | DATE SUBMITTED<br>Friday, July 24, 2026, 12:10 pm |

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

Filed and Attested by the
Office of Judicial Records
24 JUL 2026 12:10 pm
L. BREWINGTON

CHRISTOPHER EVANS,
*Plaintiff.*

v.

DRAFTKINGS INC. and CROWN PA GAMING, INC.,
*Defendants.*

July Term 2026

Case No.:________

**Jury Trial Demanded**

## NOTICE TO DEFEND

### NOTICE

**You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.**

***You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.***

**Philadelphia Bar Association
Lawyer Referral
and Information Service
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197**

### AVISO

**Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decider a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.**

***Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.***

**Asociacion De Licenciados
De Filadelfia
Servicio De Referencia E
Informacion Legal
One Reading Center
Filadelfia, Pennsylvania 19107
(215) 238-6333
TTY (215) 451-6197**

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

CHRISTOPHER EVANS,
*Plaintiff.*

v.

DRAFTKINGS INC. and CROWN PA GAMING, INC.,
*Defendants.*

July Term 2026

Case No.:________

**Jury Trial Demanded**

Plaintiff CHRISTOPHER EVANS by and through his attorneys, Aylstock, Witkin, Kreis, & Overholtz, PLC, hereby brings this action against DraftKings Inc. and Crown PA Gaming, Inc. (collectively with DraftKings Inc., "DraftKings"), (collectively with DraftKings, "Defendants"). Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiffs' attorneys as to all other matters:

**NATURE OF THE ACTION**

1. Sports gambling mobile applications ("apps") have recently exploded in popularity. Their dangerously addictive design exploits users' vulnerabilities through constant accessibility on smartphones, turning a simple tap into an unlimited gateway for compulsive betting. DraftKings designed and developed some of the most popular sports betting apps. Their gambling apps track every user interaction including wagers placed, time spent on the apps, and even moments of hesitation to create hyper-personalized algorithms. Utilizing this data, the apps bombard gamblers, including gamblers that they know or should know are problem gamblers, with targeted notifications and advertisements precisely when they're most susceptible, like late at night or after a big loss. The apps deploy targeted promotions like "risk-free bets" and deposit bonuses that mask



Case ID: 260702927

losses while encouraging larger wagers. They utilize "push notifications" that direct the user to revisit the apps after they have been away or inactive. The apps additionally offer exclusive "VIP" concierge programs offering lavish perks, private account managers, and accelerated payouts to make frequent and high-volume bettors feel valued and indispensable. DraftKings also offers casino gaming within their sports gambling app, encouraging users to utilize the casino games as "instantaneous" gambling through methods such as virtual slots. As the company behind these apps, DraftKings knowingly refuses to implement any reasonable safeguards and, in fact, intentionally designs their sports gambling platforms to addict users. Consequently, their customers face massive monetary losses, bankruptcy, career loss, physical harm, and mental anguish, such as depression and even suicide when they fall into gambling addiction.

## PARTIES

2. Plaintiff CHRISTOPHER EVANS is a natural person and resident of Philadelphia, Pennsylvania (Philadelphia County) where he suffers from gambling addiction disorder and gambling-related anxiety and depression.

3. Defendant DraftKings, Inc. is a Nevada corporation with its principal offices in Boston, Massachusetts. Based on information and belief, DraftKings, Inc. controls and directs the Pennsylvania operations of its subsidiaries and affiliates (listed herein), including the development, distribution, and operation of the DraftKings online sportsbook platform (the "DraftKings Sportsbook App") offered to consumers in Pennsylvania.

4. Defendant Crown PA Gaming, Inc. is a Delaware corporation with its principal place of business in Boston, Massachusetts. Crown PA Gaming, Inc. is a subsidiary of DraftKings, Inc. Crown PA Gaming, Inc. has been registered to do business in Pennsylvania at all times relevant to this action. Based on information and belief, Crown PA Gaming Inc. conducts a portion of



Case ID: 260702927

DraftKings Inc.'s Pennsylvania business, including activities related to the operation of the DraftKings' Sportsbook App. DraftKings, Inc. and Crown PA Gaming Inc. are referred to collectively herein as "DraftKings."

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over the instant civil matter pursuant to 42 Pa.C.S.A. § 931, which provides the Courts of Common Pleas with jurisdiction over this action, as the law vests the Courts of Common Pleas with unlimited jurisdiction over all actions and proceeding cognizable by law or usage in the courts of common pleas in the State of Pennsylvania.

6. This Court has personal jurisdiction over Defendants DraftKings, Inc., and Crown PA Gaming, Inc., pursuant to 42 Pa.C.S.A. § 5301(a) as each of these Defendants has registered as a foreign entity in the Commonwealth of Pennsylvania, and in registering, has consented to the exercise of personal jurisdiction of the Courts of this Commonwealth.

7. Venue is proper in Philadelphia County pursuant to Penn. R. Civ. P. 1006(a)(1)-(3) and 2179(a)(2)-(4).

## STATEMENT OF FACTS

### I. Online Sports Gambling and the Industry Model

*A. The Growth of Online Sports Gambling*

8. The United States has experienced an unprecedented expansion of online sports betting and mobile gambling over the past six years. Following the Supreme Court's decision in *Murphy v. NCAA*, 584 U.S. 453 (2018), which opened the door for state-by-state legalization of sports betting, thirty-nine states and the District of Columbia have legalized sports betting in some form. An explosion in online sports gambling followed, with today's current industry landscape driven by two dominant players: Defendant DraftKings, and FanDuel.



Case ID: 260702927

9. In an industry, such as "[t]he global gambling industry," where the market, "is rapidly expanding, with net losses by consumers projected to reach nearly US $700 billion by 2028," competition for attention and capital is fierce.[1]

10. Thus, it follows that this industry expansion, "is fuelled [sic] by the rise of online gambling, widespread accessibility of gambling opportunities through mobile phones, increased legalisation [sic], and the introduction of commercial gambling to new areas" where consumers have instantaneous and around-the-clock access to gambling and minimum barriers exist between their daily lives and their gambling.[2]

11. According to William C. Miller, Jr., President and CEO of the American Gaming Association, "[p]ropelled by another year of strong organic growth in existing online markets for both sports betting and iGaming," during the year 2024, "the commercial casino sector enjoyed a third consecutive record year with gaming revenue accelerating by 7.5 percent to $72 billion."[3] "The unprecedented success," as Mr. Miller sees it, "comes as more Americans than ever before have access to, and allocate their entertainment budgets to, the legal, regulated gaming market."[4] This has followed naturally from more users increasingly gambling on their phone via apps that allow users to wager from any location at any hour.[5]

---

[1] Heather Wardle et al., *The Lancet Public Health Commission on Gambling*, 9 Lancet Pub. Health e950, e950 (2024), https://doi.org/10.1016/S2468-2667(24)00167-1 (last visited Mar. 22, 2026) (citing Pekka Sulkunen et al., Setting Limits: Gambling, Science and Public Policy (2019); Gambling Research Exchange Ontario, Proportion of Revenue from Problem Gambling (2019)).
[2] *Id.* at e950.
[3] Am. Gaming Ass'n, *State of the States 2025: The AGA Analysis of the Commercial Casino Industry* 2 (May 2025), https://www.americangaming.org/wp-content/uploads/2025/05/AGA-State-of-the-States-2025.pdf (last visited Mar. 25, 2026).
[4] *Id.* at 2.
[5] Statista Digital Mkt. Insights, *Market Size of the Online Gambling Industry in the United States from 2017 to 2023, with a Forecast Until 2028*, Statista (Mar. 11, 2024), https://www.statista.com/forecasts/1318601/online-gambling-market-size-us (last visited Mar. 24, 2026).



Case ID: 260702927

12. Together, FanDuel and DraftKings dominate the marketplace for online gambling, generating a majority of online sports gambling revenue, resulting in a functional duopoly.[6][7]

*B. How the Industry Profits Off of User Losses and Addictive Gambling*

13. Defendants' businesses are dependent on customer losses. The more money a customer loses, the more revenue Defendants generate. This is not incidental to the business model; it is the business model. DraftKings' 2025 10-K filing, for example, claims their "revenues are predominantly generated through two product offerings – Sportsbook and iGaming. These two product offerings accounted for 93%, 93%, and 91% of DraftKings' revenue for the fiscal years ended December 31, 2025, 2024, and 2023, respectively."[8]

14. DraftKings' 2025 SEC filings confirm the Company's sales and marketing costs "increased $115.0 million, or 9.1%, to $1.4 billion in 2025, from $1.3 billion in 2024 . . . ." comprising almost 23 cents for every dollar of revenue generated.[9] The goal of their marketing spend, as DraftKings puts it, is "to grow and retain our paid user base, including personalized cross-product offers and promotions, and promote brand awareness to attract the 'skin-in-the-game' sports fan. Together these investments have enabled us to create a leading product built on scalable technology, while attracting a user base that has resulted in the rapid growth of our business."[10]

---

[6] Matt Mariani, *Turning the Page on a Record 2024 for US Sports Betting*, Legal Sports Rep. (June 13, 2025), https://www.legalsportsreport.com/218449/2024-us-sports-betting-revenue/ (last visited Mar. 24, 2026) ("FanDuel and DraftKings remain the overwhelming market leaders, together accounting for more than 65% of the industry's output nationwide.")

[7] Flutter Entertainment plc, Annual Report (Form 10-K) at 1 (Mar. 4, 2025) ("Flutter is the world's largest leading online sports betting and iGaming operator based of revenue.").

[8] DraftKings Inc., Annual Report (Form 10-K), at 3-4 (Feb. 13, 2026), https://www.sec.gov/ix?doc=/Archives/edgar/data/1883685/000188368526000013/dkng-20251231.htm (last visited Mar. 22, 2026).

[9] *Id.* at 55.

[10] *Id.* at 48.



Case ID: 260702927

*C. The Fundamental Conflict: Profitability and User Well-Being*

15. The *Lancet Public Health* Commission on Gambling published findings in October of 2024 which argued that, using their power across various domains of public life, gambling companies push to frame gambling as beneficial to society, whereas the harms incurred are more so blamed on poor user choices than inherent negative qualities of gambling.[11] This aim, directed toward protecting industry perception, stifles discussions on the negative impacts of gambling and reveals the fundamental conflict between Defendants' business success and the well-being of their users.

16. The truth is that sports betting apps are different than any other type of gambling. Defendants' sports betting apps utilize addictive technology and features, such as "push" notifications, targeted advertisements, and personalized bonus incentives to continuously draw users back to the app.

*D. Problem Gamblers Drive Revenue*

17. In sports gambling, a small minority of gamblers drive the majority of profitability. It is therefore expected that sports gambling operators' business models are structurally focused on this subset of individuals.[12] Denoted as "Problem Gamblers," one investigation, conducted by Gemini Research, Inc. of Northampton, Massachusetts and led by Dr. Rachel A. Volberg, President of Gemini Research and a Research Professor at the University of Massachusetts Amherst's School of Public Health, analyzed the post-legalization period of sports gambling in Connecticut.[13] The study found that less than 2% of Connecticut residents, considered to be "Problem Gamblers" (the

---

[11] Wardle et al., 9 Lancet Pub. Health at e964.
[12] *Id.* at e958.
[13] Gemini Research, *Impacts of Legalized Gambling in Connecticut* (Conn. Dep't of Mental Health & Addiction Servs. Jan. 2024), https://portal.ct.gov/-/media/dmhas/publications/2023-ct-final-report-jan312024.pdf (last visited Mar. 22, 2026).

percentage of Connecticut residents estimated to have a gambling problem), were responsible for 51% of the sports betting revenue in Connecticut.[14] These findings not only demonstrate that a small minority of problematic gamblers drive Defendants' profits: they evidence that Defendants' profitability is a function of the most addicted, problem users.

## II. The Science Behind Addiction and Gambling Disorder

### *A. The Neurological Mechanisms Driving Bets*

18. A 2023 review article synthesizing neuroscience and behavioral psychology literature explains how modern gambling products are engineered to exploit the human brain.[15] One of the key findings is that, "[c]ollectively, the data suggest that inconsistent reward delivery in models of gambling may represent a special case of a broader phenomenon: i.e., variability (provided it is random) may be crucial for development of sensitization to both drug- and non-drug rewards."[16] The authors further assert that "multiple sources of variability exist and operate concurrently in modern digital products," including gambling, and that ultimately, "these overlapping sources of variability will amplify the addictive potential of these products via incentive sensitization."[17] Notably, modern digital gambling products layer multiple concurrent sources of this engineered variability – variable payout size, bonus features, temporal variability in spin duration, and near-miss mechanics, to drive "perpetual escalation ('hyper-learning')" in dopaminergic signaling analogous to that produced by addictive drugs.[18] Two moderating factors

[14] *Id.*
[15] Luke Clark & Martin Zack, *Engineered Highs: Reward Variability and Frequency as Potential Prerequisites of Behavioural Addiction*, 140 Addictive Behavs. 107626 (2023), https://doi.org/10.1016/j.addbeh.2023.107626 (last visited Mar. 22, 2026).
[16] *Id.* at 2.
[17] *Id.* at 2.
[18] *Id.* at 2-3.



Case ID: 260702927

amplify this process: the time course and resolution of uncertainty, and the frequency of exposure, as "both variability and frequency likely contribute to the addictive potential of a non-drug reinforcer."[19] The authors conclude that digital technology "has permitted engineering of reinforcers with addictive potential that, delivered under natural conditions, would likely never become addictive."[20]

*B. Mobile Gambling Platforms Intensify Addictive Potential*

19. Mobile gambling platforms intensify the addictive properties of gambling in several independent and compounding ways. First, 24/7 access from any location eliminates the need to travel to a physical gambling venue. Second, the absence of a social environment removes the social inhibitions and shame responses that moderate in-person gambling. Third, the speed of mobile wagering — a bet can be placed in under five seconds — compresses the interval between impulse and action below the threshold at which rational deliberation can intervene. Fourth, "push" notifications, bonus alerts, and in-app badges create a persistent ambient presence in the user's daily life, inviting re-engagement at moments of boredom, stress, financial anxiety, or emotional vulnerability. Defendants utilize the combination of advanced technology and artificial intelligence paired with the tracking of personalized user data to intentionally addict users and continuously lure them back to their sports gambling apps.

20. As a result of constant access through ease-of-use Apps and the ability to bet on a Smartphone, Pennsylvania has seen a crisis emerge in the State. By just one example, though November 2025, the State of Pennsylvania's gambling hotline had already received more than twice as many calls for the year than in the year 2020, with the volume of calls topping a previous

---

[19] *Id.* at 5.
[20] *Id.*



Case ID: 260702927

record set in 2023.[21] And according to *Philadelphia Today*, between the years 2021 and 2025, "calls to the help hotline increased by 40% . . ."[22] These increases are not arbitrary, but are a direct and proximate result of Defendants' online and mobile sportsbook apps intensifying addiction potential for users.

## III. Defendants' Knowledge of Addictive Design

### A. *Defendants' Knowledge of Problem Gambling Patterns*

21. DraftKings' Form 10-K for the fiscal year ended December 31, 2024 discloses that the company uses "a blend of analytics and data science" as the "foundation" of its marketing to "acquire, retain and reactivate users," and reports "Monthly Unique Payers" ("MUPs") and "Average Revenue per MUP" ("ARPMUP") as key performance indicators.[23] The filing further discloses that DraftKings deploys "data science and machine learning to help optimize conversion and monetization," including "recommendation engines" that "present betting markets to users based upon their past play history," algorithms that identify "the type of contests that a contestant is most likely to enter, along with the entry fee and prize structure that he or she will find most appealing," and "return-on-investment models that are based on gross profit paybacks, lifetime value, player segmentation and customer and revenue retention." The company also optimizes "marketing spend using data collected since the beginning of [its] operations," including

---

[21] Isaac Avilucea, *Pennsylvania's Problem Gambling Hotline Calls Soar in 2025*, Axios Phila. (Dec. 17, 2025), https://www.axios.com/local/philadelphia/2025/12/17/pennsylvania-problem-gambling-hotline-calls-soar-in-2025 (last visited Mar. 31, 2026).
[22] Saleen Martin, *Youth Gambling Addiction Surges Amid Sports Betting Boom*, Phila. Today (Mar. 27, 2026), https://nationaltoday.com/us/pa/philadelphia/news/2026/03/27/youth-gambling-addiction-surges-amid-sports-betting-boom/ (last visited Mar. 31, 2026).
[23] DraftKings Inc., Annual Report (Form 10-K) (Feb. 14, 2025), https://www.sec.gov/Archives/edgar/data/0001883685/000188368525000010/dkng-20241231.htm.



Case ID: 260702927

"predicted lifetime value and behavior of users across various product offerings" and "personalized cross-product offers and promotions."

22. The data infrastructure required to build individualized behavioral profiles for targeted marketing and lifetime-value modeling necessarily produces, at the individual account level, visibility into patterns characteristic of disordered gambling—including escalating engagement and sustained high-frequency play—among the users who disproportionately drive the MUP and ARPMUP metrics reported to investors. DraftKings cannot credibly disclaim knowledge of problem gambling patterns while simultaneously reporting metrics derived from the same user-level data systems it employs to maximize per-user monetization.

23. Defendants have full visibility into users' concerning betting patterns and then push the users to gamble further through targeted advertising, personalized "bonus" incentives, and "push" notifications as discussed and explained above. Defendants' behavior preys on addicted gamblers, as Defendants can predict when users will escalate into dangerous addictive gambling and intentionally target users when this happens.

## IV. The Deliberate Persuasive Design Architecture

### *A. Variable Reward Mechanisms*

#### *i. Near Miss Engineering*

24. In a landmark 2009 study published in *Neuron*, Dr. Luke Clark and colleagues at the University of Cambridge's Behavioural and Clinical Neuroscience Institute used functional magnetic resonance imaging (fMRI) to demonstrate that near-miss gambling outcomes activate win-related brain circuitry in the ventral striatum and anterior insula despite delivering no monetary reward, and that near-miss events measurably increased participants' reported desire and



Case ID: 260702927

motivation to continue gambling.[24] The study established that near-miss outcomes are not neutral perceptual events but are actively processed by the brain's reward system in a manner that reinforces continued play independent of the absence of any actual reward.

25. Chase and Clark extended this research in a 2010 fMRI study published in *The Journal of Neuroscience*, scanning 20 regular gamblers of varying severity. The study found that gambling severity, measured using the validated South Oaks Gambling Screen, predicted the strength of dopaminergic midbrain activation in response to near-miss outcomes: the more severe the gambling disorder, the more strongly the midbrain fired in response to a near-miss, approaching the level of response to an actual monetary win.[25]

*B. Loss Chasing Features: Frictionless Re-Entry and Asymmetric Withdrawal Barriers*

26. A 2025 peer-reviewed study published in *Addiction* by Dr. Philip Newall of the University of Bristol School of Psychological Science catalogued in granular detail the specific "sludge" and "dark pattern" mechanisms deployed by online gambling platforms to asymmetrically impede exit while facilitating deposits. The study documented that: (a) gambling websites process deposits instantly while imposing delays of up to several days on withdrawals; (b) during withdrawal delays, platforms display prominent buttons prompting gamblers to reverse the withdrawal; (c) deposit pages are accessible via fewer clicks from the homepage than corresponding withdrawal pages, a deliberately engineered friction asymmetry; (d) 70% of audited gambling websites suggested in-game bet sizes greater than the minimum allowed; and (e) 60% of platforms had reality-check tools

---

[24] Luke Clark et al., *Gambling Near-Misses Enhance Motivation to Gamble and Recruit Win-Related Brain Circuitry*, 61 Neuron 481 (2009), https://pmc.ncbi.nlm.nih.gov/articles/PMC2658737/ (last visited Mar. 25, 2026).

[25] Henry W. Chase & Luke Clark, *Gambling Severity Predicts Midbrain Response to Near-Miss Outcomes*, 30 J. Neuroscience 6180 (2010), https://www.jneurosci.org/content/30/18/6180 (last visited Mar. 25, 2026).



Case ID: 260702927

defaulted to the maximum allowed delay of four hours, the least protective configuration, rather than shorter intervals.[26] Each of these design choices is individually documentable as an affirmative product design decision by Defendants to maximize the difficulty of exit.

27. DraftKings' platform has been specifically alleged in a multi-state class action, reported by Gambling Insider in January 2026, to allow users to immediately raise self-imposed betting limits the moment a prior restriction period expires, with no enforced cooling-off period between expiration and reactivation of a higher limit.[27] Screenshots submitted in that litigation show that FanDuel and BetMGM both require three-day delays before self-imposed limit increases take effect, but DraftKings processes the limit increase immediately. This design choice directly and specifically facilitates loss chasing in the moment immediately after a user's own voluntary restraint expires, exploiting the recency of the constraint and the compulsive urge that follows it.

*C. Personalized Algorithms*

28. A 2025 peer-reviewed study published in *Behavioral Sciences* (PMC/MDPI) analyzed behavioral data from an online gambling platform at two time points (late 2016 and spring 2021) and found that patterns consistent with AI-driven personalization were associated with increases in betting persistence, risk-taking, and tendency to retain funds on-platform rather than withdraw.[28] The study concluded that AI-driven engagement algorithms "co-create behavioral risks" and that "algorithms must not be designed to take advantage of players' impulsivity or

---

[26] Philip Newall, *Sludge, Dark Patterns and Dark Nudges: A Taxonomy of Online Gambling Platforms' Deceptive Design Features*, 120 Addiction 1916 (2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12426356/ (last visited Mar. 25, 2026).

[27] *DraftKings Sued in Seven States Over Alleged Betting Limit Violations*, Gambling Insider (Jan. 9, 2026), https://www.gamblinginsider.com/news/102325/draftkings-class-action-betting-limit-violations (last visited Mar. 25, 2026).

[28] Niklas Kolomaznik, Ewa Oborska & Dragoș-Marian Iordache, *AI Personalization and Its Influence on Online Gamblers' Behavior*, 15 Behav. Sci., art. 779 (2025), https://doi.org/10.3390/bs15060779 (last visited Mar. 25, 2026).



Case ID: 260702927

cognitive biases. In other words, the AI should not monetize moments of temporary loss of self-control."[29] Defendants operate sophisticated AI-powered engagement platforms that, on information and belief, employ the precise personalization mechanisms the study identifies as risk-generating.

*D. VIP Loyalty Programs: Targeting and Escalating Engagement of High-Loss Users*

29. A 2017 evidence review by Dr. Michael Wohl, commissioned by the independent, non-industry Gambling Research Exchange Ontario (GREO), concluded that disordered gamblers are over-represented in gambling loyalty programs relative to the general gambling population, and that gambling loyalty programs that reward volume of play uniquely exacerbate harm in users who cannot control their gambling behavior, unlike loyalty programs in other consumer industries.[30] The report identified that the industry uses "special treatment for gamblers to soften the blow of gambling losses, making the gambler feel like a very important person (VIP)" as a retention mechanism that specifically rewards the behaviors most pathognomonic of gambling disorder: frequency, deposit volume, and loss escalation.[31]

30. Defendants utilize "VIP" managers to offer personalized attention to high-volume gamblers. The "VIP" managers offer concierge services, such as free tickets to professional sporting events, often including suite access to entice users to attend. Additionally, "VIP" managers offer gambling-based incentives for users that attend their events, including promises of "bonus" bets loaded to the users' account in exchange for their attendance.

---

[29] *Id.*

[30] Michael J.A. Wohl, *Loyalty Programs in the Gambling Industry*, GREO Evidence Exchange Report (2017), https://www.greo.ca/Modules/EvidenceCentre/files/Wohl%20(2017)%20Loyalty%20programs%20in%20the%20gambling%20industry.pdf (last visited Mar. 25, 2026).

[31] *Id.*



Case ID: 260702927

31. The "VIP" managers hired and managed by Defendants are directly available to users, including via text and phone call access where they can continuously reach out and contact users. The "VIP" managers act as an extension of the apps, offering real-time betting incentives, further luring high-volume users into addictive and excessive gambling patterns.

*E. Removal of Natural Stopping Cues*

32. Professor Natasha Dow Schüll of MIT's Program in Science, Technology, and Society conducted fifteen years of ethnographic field research in Las Vegas, published as *Addiction by Design: Machine Gambling in Las Vegas* (Princeton University Press, 2012). Schüll documented that gambling machines are deliberately engineered to induce a dissociative state she calls "the machine zone" — a psychological condition in which time, space, and external social awareness dissolve and players gamble "not to win but simply to keep playing, for as long as possible."[32] The design features producing and maintaining this state include: removal of clocks and external time cues, elimination of natural pauses between bets, high-speed continuous play, and seamless re-deposit flows. Schüll documented these as reflecting "the strategic calculations behind game algorithms and machine ergonomics" designed expressly to maximize "time on device." Defendant DraftKings has transposed these design principles into their mobile gambling application, as their application allows for instantaneous betting with instant deposit mechanisms.

*F. Predatory Bonus Structure*

33. Defendants deployed "risk-free bet," "free bet," and equivalent promotional language as primary customer acquisition tools from the time of their respective state market launches through at least early 2023. Under these promotions, a user who lost their first bet

---

[32] Natasha Dow Schüll, Addiction by Design: Machine Gambling in Las Vegas (Princeton Univ. Press 2012), https://press.princeton.edu/books/paperback/9780691278285/addiction-by-design.



Case ID: 260702927

received not cash but non-withdrawable "bonus" credits subject to complex wagering requirements requiring the user to continue gambling multiple times before the credit's value could be withdrawn as cash. "Risk-free" was materially false and misleading: the user's principal was indisputably at risk, was in fact lost, and could be recovered only by continued gambling. In March 2023, the American Gaming Association ("AGA"), of which DraftKings was then a member, formally amended its Responsible Marketing Code to ban all use of "risk-free" in advertising, acknowledging that prior promotional language was deceptive.[33] Defendants had continued to use this language while the AGA's own code was being revised, with knowledge that regulators in Ohio and Massachusetts had already taken enforcement action against these promotions, and knowing gambling advertising regulations that specifically outlawed the offer of "risk free" promotions (and promotions using similar language) were being promulgated.

*G. Microbets*

34. An additional addictive feature of Defendants' online sports gambling apps is the promotion of "microbets." Microbets are in-game wagers that allow for betting on live, hyper-specific events, which often have nothing to do with the overall outcome of the sporting event. Some examples of microbets are allowing bets on the outcome of the next baseball pitch or whether the next pass will be completed in a football game.

35. These microbets allow gamblers to continuously place bets during a sporting event and provide a constant reward/loss cycle that can result in a series of dopamine boosts. These are

[33] Am. Gaming Ass'n, *New Updates to AGA Responsible Marketing Code Prohibit 'Risk Free'* (Mar. 2023), https://www.americangaming.org/new-updates-to-aga-responsible-marketing-code-for-sports-wagering-prohibit-risk-free-enhance-college-aged-protections/ (last visited Mar. 25, 2026); *see also Wagers and Warnings*, ABA Judges' J., Fall 2024, https://www.americanbar.org/groups/judicial/resources/judges-journal/2024-fall/wagers-warnings-state-sports-betting-advertisements/ (last visited Mar. 25, 2026).



Case ID: 260702927

designed to further draw the user into placing these constant bets without having to wait on the ultimate outcome of a game. Micro-betting has been continuously linked to severe problem gambling and impulsivity.[34]

36. The addictive design of Defendants' sports gambling apps is intentional. Their utilization of user data and user targeting to implement intentionally addictive features has led users, such as Plaintiff CHRISTOPHER EVANS, to be sucked into a vicious cycle of gambling addiction that has led to economic losses, mental anguish, and the physical manifestations of that mental anguish.

**PLAINTIFF CHRISTOPHER EVANS' SPECIFIC FACTS**

37. Plaintiff CHRISTOPHER EVANS placed bets and gambled through DraftKings' mobile applications. He began using the DraftKings applications in or around August 2017. After becoming legal in Philadelphia to gamble using the applications, Plaintiff CHRISTOPHER EVANS began gambling on the DraftKings applications and eventually developed an unmanageable addiction to Defendant DraftKings gambling application.

38. Plaintiff CHRISTOPHER EVANS history of play on DraftKings' app demonstrates a rapid escalation, and loss of control, of which DraftKings was all too aware. Since starting to use DraftKings, Plaintiff has wagered over $2,100,000.00 with net losses of approximately $81,000.00.

39. Plaintiff CHRISTOPHER EVANS constantly received targeted promotions, personalized push notifications, and incentives like prop bets and free credits intended to repetitively lure him back into the gambling applications.

---

[34] Quintero Garzola GC, Vaccarino A. *Microbetting, Fantasy Sports and Risk of Gambling Disorder: A Scoping Review*. 40 J. Gambling Stud. 587-600 (2024) (PubMED PMID: 37452978), https://pubmed.ncbi.nlm.nih.gov/37452978/ (last visited Mar. 25, 2026).



Case ID: 260702927

40. Plaintiff CHRISTOPHER EVANS also had a VIP account manager, who would send him promotional offers, bonuses, and perks.

41. Plaintiff CHRISTOPHER EVANS fell deeply into his addiction and would find himself spending hours each day gambling within the applications, specifically playing casino games due to their quick and instantaneous nature and easy allowance of betting, but also engaging with sportsbook and daily fantasy gambling. He soon began suffering from depression and anxiety and stopped going outside altogether in favor of gambling all day.

42. The time Plaintiff CHRISTOPHER EVANS spent gambling on the app quickly began to negatively affect his employment, creating financial strain that has placed him into debt and resulted in the repossession of his vehicle.

43. Plaintiff CHRISTOPHER EVANS has also faced significant strain in his personal relationships due to Defendant's addictive gambling application. His gambling addiction has impacted his ability to form and maintain social relationships and resulted in his wife separating from him.

44. Plaintiff CHRISTOPHER EVANS was formally diagnosed with depression in 2020 and struggles with symptoms of anxiety and fear.

45. As a result of his addiction to the DraftKings gambling application, Plaintiff CHRISTOPHER EVANS has experienced physical and mental health problems including anxiety and depression, gambling addiction, negative effects to his relationships, and loss of funds far more than his income. These facts at all times relevant were known to DraftKings, who encouraged the Plaintiff to gamble more often, and at higher levels.

**COUNT I**
**BREACH OF WARRANTY – DEFECTIVE DESIGN**
**Against All Defendants**

46. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

47. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefited from their products used by Plaintiff.

48. Defendant's app and platforms are designed and intended to be utilized as online sports betting products.

49. Defendants' products are distributed and made available to the public through the Defendant's mobile applications.

50. Defendants' products are marketed and advertised to the public for the personal use of the end-user/consumer.

51. Defendants, as the designers, developers, managers, operators, testers, producers, labelers, marketers, advertisers, promoters, controllers, suppliers, distributors, and benefiters of their products, impliedly warranted that such products were merchantable and fit for the ordinary purposes for which they were intended.

52. Defendants breached this warranty because the online sport betting products they designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed, and benefited from were defective and unreasonably dangerous to users and consumers, including Plaintiff.

53. Defendants defectively designed their products to addict all users of their sports gambling apps.

54. Defendants' apps are unreasonably dangerous as designed and rely on product features that are unreasonably dangerous and addictive.

55. Plaintiff used these products in a manner in which Defendants intended and expected them to be used, and Defendants knew, or by the exercise of reasonable care, should have known, that Plaintiff would use these products without inspection for or knowledge of their addictive nature.

56. Defendants' products are defective in design and pose a substantial likelihood of harm for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

57. Plaintiff, as the consumer of Defendants' products, did not expect the products to be psychologically and neurologically addictive, far beyond that which might be expected from non-online gambling and/or non-online sports betting when the products are used in their intended manner by their intended audiences.

58. Plaintiff, as the consumer of Defendants' products, did not expect the algorithms and other features embedded by Defendants in their products to make them initially and progressively more stimulative, to maximize the consumers' usage time and spending on online sports betting.

59. Plaintiff, as the consumer of Defendants' products, did not expect each Defendant's revenues and profits to be directly tied to the strength of these addictive mechanisms.

60. Defendants' products are likewise defectively designed in that they create an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use beyond that which might be expected from non-online gambling and/or non-online sports betting, which can

lead to numerous harms including but not limited to gambling losses, eviction or foreclosure, bankruptcy, stress, family breakup and career loss, mental anguish, and physical harm.

61. The risks inherent in the design of Defendants' products significantly outweigh any benefit of such design.

62. Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including algorithmic changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

a. Default protective limits to the amounts spent on sports betting and/or the amount of time spent on the site;
b. Opt-in restrictions to the amount spent on sports betting and/or the amount of time spent on the site;
c. Self-limiting tools, including but not limited to sports betting amount and/or time spent notifications, warnings or reports;
d. Blocks to use during certain times of day;
e. Redesigning algorithms to limit rather than promote addictive engagement;
f. Eliminating the use of "push" notifications to draw users back to the apps;
g. Limits on the strategic timing and clustering of notifications to lure back users;
h. Removing barriers to the deactivation and deletion of accounts;
i. Limit or eliminating artificial intelligence to track individual player's gambling habits;
j. Eliminating the offering of "VIP" managers and personalized betting incentives;
k. Limit or eliminating the use of artificial intelligence to create individualized offers and promotions to customers—especially in the near aftermath of large losses;
l. Limit or eliminating the use of microbets and prop bets that lead to accelerated, uncontrolled gambling; and
m. Limit or prohibiting one or more advertisements to induce gambling with phrases such as "bonus," "no sweat," "risk free," odds boosts, or similar promotions.

63. Alternative designs were available that would reduce users' addictive and compulsive engagement with each of the Defendants' products, and which would have effectively



Case ID: 260702927

served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

64. Plaintiff used Defendants' products as intended or in reasonably foreseeable ways.

65. As a direct and proximate result of each of the Defendants' conduct and defectively designed product, Plaintiff developed a gambling addiction disorder and suffered physical harm, mental anguish, stress, and economic losses from online sports betting and related economic losses arising therefrom.

## COUNT II
## BREACH OF WARRANTY – FAILURE TO WARN

**Against All Defendants**

66. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

67. Defendants' sports betting apps are unreasonably dangerous as designed and rely on product features that are unreasonably dangerous.

68. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its products used by Plaintiff.

69. Plaintiff was a foreseeable user of Defendants' products.

70. Defendants' products are distributed to the public through the Defendants' sports gambling applications.

71. Defendants distributed and made their platforms available to Plaintiff in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to its users, as described herein, including risk of addiction and compulsive use which can lead to

numerous harms including gambling losses, eviction or foreclosure, bankruptcy, stress, career loss, family breakup, and physical and mental impacts, such as depression, anxiety, and irritability.

72. Defendants' products are dangerous in that they create an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use beyond that which might be expected from non-online gambling and/or non-online sports betting, which can lead to numerous harms including but not limited to gambling losses, eviction or foreclosure, bankruptcy, stress, family breakup, loss of career, mental anguish including depression and anxiety, and the physical manifestations of that mental anguish.

73. Defendants knew or, by the exercise of reasonable care, should have known that their products posed risks of harm to their users considering their own internal data and knowledge regarding their products at the time of development, design, marketing, promotion, advertising, and distribution.

74. Defendants knew or, by the exercise of reasonable care, should have known that their products posed risks of harm to each particular user based on Defendants' personalized data collection specific to Plaintiff, including but not limited to Plaintiff's gambling habits, time spent on their apps, Plaintiff's significant losses, Plaintiff's high number of bets placed, and Plaintiff's use of his "VIP" manager.

75. Defendants' products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

a. Defendants' products cause addiction, compulsive use, and/or other concomitant physical and mental injuries and emotional distress;
b. Defendants' products harvest and utilize data in such a way that increases a user's risk of addiction to these products and concomitant physical and mental injuries and emotional distress;



Case ID: 260702927

c. The algorithmically-targeted advertisements and contact with the Plaintiff by Defendants are designed to encourage compulsive sports betting and use of the products and to discourage the Plaintiff from reducing, pausing and/or ceasing online sports betting by and through the product, thus raising the risk of harms including gambling losses and related economic losses;

d. The use of "VIP" managers providing personalized incentives to Plaintiff would further his gambling addiction by constantly luring him in to placing additional, larger bets;

e. The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another, and by algorithms and other source code design that is currently publicly unknown and unavailable for review and inspection by users and governmental entities.

76. Ordinary users, such as Plaintiff, would not have recognized the potential risks of Defendants' products when used in a manner reasonably foreseeable to each of the Defendants.

77. Had Plaintiff received proper or adequate warnings or instructions as to the risks of using Defendants' products, Plaintiff would have heeded the warnings and/or instructions.

78. Each Defendants' failure to adequately warn Plaintiff about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Plaintiff.

79. As a direct and proximate result of Defendants' conduct and failure to warn of the unreasonable risks of its products, Plaintiff suffered physical harm, mental anguish, stress, and loss of career, and further related economic losses arising therefrom due to online sports betting on Defendants' platforms.

## COUNT III
## NEGLIGENT DESIGN

### Against All Defendants

80. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

81. At all relevant times, Defendants were engaged in the business of designing online sports betting apps.

82. At all relevant times, the Defendants had a duty to exercise reasonable care to carefully and properly design their products to be reasonably safe online sports betting apps.

83. Defendants breached that duty because the online sports betting apps that they designed were unreasonably dangerous and defective for the reasons described above.

84. Because of the Defendants' failure to properly design their online sports betting apps, those products were placed on the market and distributed to Plaintiff while they were in an unreasonably dangerous and defective condition.

85. Plaintiff downloaded and used the online sports betting apps, which were in an unreasonably dangerous and defective condition at the time of purchase, in a reasonably foreseeable manner and substantially as intended by the Defendants.

86. Defendants knew or by an exercise of reasonable care should have known their products would create addiction, financial collapse, physical harm, and mental anguish.

87. Defendants knew or by an exercise of reasonable care should have known their products would not generate long-term, healthy users, but would instead extract short-term value, especially from individuals at moments of optimized emotional and cognitive vulnerability.

88. As a direct and proximate result, Plaintiff suffered the injuries described above.

89. It was foreseeable that consumers like Plaintiff who used Defendants' online sports betting apps would, as a direct and proximate result, suffer those injuries.

90. In light of what they knew or should have known, Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

91. Through these actions and inactions, Defendants knowingly risked the financial wellbeing and mental and physical health of unsuspecting consumers, including Plaintiff, in order to continue making a profit.

**COUNT IV**
**NEGLIGENT FAILURE TO WARN**

**Against All Defendants**

92. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

93. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its products used by Plaintiff.

94. Plaintiff was a foreseeable user of Defendants' products.

95. At all relevant times, Defendants had a duty to exercise reasonable care to carefully and properly warn Plaintiff and the general public about the reasonably foreseeable risks and dangers of their products.

96. Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, addictive, and injurious when used in a reasonably foreseeable manner.

97. Because of Defendants' failure to properly design their online sports betting apps, those products were placed on the market and distributed to Plaintiff while they were in an unreasonably dangerous and defective condition.

98. Plaintiff downloaded and used the online sports betting apps, which were in an unreasonably dangerous and defective condition at the time of download, in a reasonably foreseeable manner and as intended by the Defendants.

99. Defendants offered no warnings to Plaintiff nor to the public of the addictive nature of their sports betting platforms despite their knowledge and utilization of the very features that make their apps addictive.

100. As a direct and proximate result, Plaintiff suffered the injuries described above.

101. It was foreseeable that consumers like Plaintiff who used Defendants' online sports betting apps would, as a direct and proximate result, suffer those injuries.

102. In light of what they knew or should have known, the Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

103. A reasonable company under the same or similar circumstances as Defendants would have provided adequate warnings to the consumers of their products.

104. Defendants could have provided adequate warnings and safeguards to consumers, such as Plaintiff, which would have prevented the harms alleged herein.

## COUNT V
## NEGLIGENCE

**Against All Defendants**

105. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

106. At all relevant times, each Defendant designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its products used by Plaintiff.

107. Plaintiff was a foreseeable user of Defendants' products.

108. At all relevant times, the Defendants had a duty to exercise reasonable care in the design, development, management, operation, testing, production, labeling, marketing, advertising, promotion, control, sales and distribution of their products.

109. Defendants knew or should have known that their products were dangerous, harmful, addictive, and injurious to their users when used in a reasonably foreseeable manner.

110. Defendants intentionally used targeted advertising, personalized "bonus" incentives, push notifications, and other features as discussed and explained above to prey on addicted gamblers or to hook recreational gamblers into a pattern of addiction.

111. Defendants knew or should have known their users, including Plaintiff, would not have realized the potential risks and dangers of using their sports gambling apps, including a risk of addiction, and compulsive betting, not present with other forms of gambling and/or offline sports betting.

112. Defendants could have avoided Plaintiff's injuries with minimal cost, including, for example, by not including or reconfiguring certain features and algorithms in their sports betting apps which harmed Plaintiff.

113. Each Defendant has breached its duties of care owed to Plaintiff through its actions, misdeeds, omissions and negligence in the design, development, management, operation, testing, production, labeling, marketing, advertising, promotion, control, sales and distribution of its products.

114. The breaches of duty by each Defendant include, but are not necessarily limited to the following:

a. Including features and algorithms in their online sports betting platforms that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of compulsive gambling and/or gambling addiction and related financial losses and other harms as discussed above;
b. Marketing and advertising to users, potential new customers, and customers that want to stop using their product both through the product itself and in general through television, internet and other media advertising;



Case ID: 260702927

c. Maintaining unreasonably dangerous features and algorithms in their platforms after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the financial, mental, emotional and physical health of its users; and
d. Utilizing "VIP" managers to offer personalized betting incentives to high volume, heavily addicted gamblers;
e. Failing to implement reasonably available means to monitor for and limit or deter excessive gambling, including patterns, frequency, or duration of use that are indicative of addiction, compulsive gambling, or excessive gambling.

115. A reasonable company under the same or similar circumstances as each Defendant would have designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, supplied, distributed and benefitted from its online sports betting platform in a manner that is safer for and more protective of its users.

116. As a direct and proximate result, Plaintiff suffered the injuries described above.

117. It was foreseeable that persons like Plaintiff who used Defendants' sports gambling apps would, as a direct and proximate result, suffer those injuries.

118. In light of what they knew or should have known, Defendants should have anticipated that these injuries were a likely result of the actions and failures to act described above.

## COUNT VI
## INTENTIONAL MISREPRESENTATION

**Against All Defendants**

119. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

120. As set forth in more detail above, Defendants knew about the defective condition of their sports gambling apps and the serious risks they posed to its users, including Plaintiff.

121. Defendants were under a duty to tell the public the truth and to disclose the defective condition of their addictive sports gambling apps and the serious risks they posed to users, including Plaintiff.



Case ID: 260702927

122. Defendants breached their duty to the public and the users of their products, including Plaintiff, by concealing, failing to disclose and making misstatements about the serious risks and addictive nature presented by their sports gambling platforms.

123. Even though Defendants knew of these risks, they intentionally concealed this information to avoid losing users and to continue to gain and addict new users.

124. By intentionally concealing and failing to disclose inherent defects in the design of their sports gambling apps, Defendants knowingly and recklessly misled the public and the users of their products, including Plaintiff, into believing that the products were not designed to addict customers to the point of bankruptcy, financial ruin and subsequent mental anguish among other injuries.

125. Defendants knew that their concealment, misstatements, and omissions were material. A reasonable person, including Plaintiff, would find information that Defendants' sports gambling apps were programmed and designed to negatively impact the users' mental capacity to gamble reasonably and diminish their ability to avoid addictive gambling to be important when deciding whether to use, or continue to use, the product.

126. Plaintiff was unaware of the dangerous and addictive nature of Defendants' sports gambling platforms and was reasonable in his failure to discover them, as they were intentionally concealed by Defendants.

127. As a direct and proximate result of Defendants' material omissions, misrepresentations, and concealment of material information, Plaintiff sustained serious physical harm, including the development of a gambling addictions disorder, pain and suffering, emotional anguish, loss of earnings, and other losses for which Plaintiff is entitled to recover the damages sought in this Complaint.



Case ID: 260702927

**COUNT VII**
**UNJUST ENRICHMENT**

**Against All Defendants**

128. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

129. As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited off intentionally addicting users of their platforms and have benefitted from the money made from these users, including Plaintiff. Plaintiff would not have lost the amounts alleged herein had it not been for Defendants' deceptive and unfair conduct.

130. Defendants' retention of those payments is unjust, for among other reasons, Plaintiff did not receive the promised or represented functionality, safety, or utility when Plaintiff utilized Defendants' sports gambling apps.

131. It would be inequitable and unjust to allow Defendants to retain the value Plaintiff paid in conjunction with the use of the defective product.

**COUNT VIII**
**PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. §§ 201 *ET SEQ.*)**

**Against All Defendants**

132. Plaintiff incorporates all the allegations set forth above herein.

133. Plaintiff purchased goods and/or services from DraftKings for Plaintiff's personal use when Plaintiff downloaded and placed bets through the DraftKings Sportsbook/Casino Apps.

134. Defendants' engaged in unfair and deceptive conduct by intentionally designing their Sportsbook/Casino Apps and or individual product features to encourage, develop, or increase compulsive and addicting gambling behavior of their users through their apps and features, including through (i) not imposing self-limiting tools, (ii) utilizing timely and persistent



Case ID: 260702927

promotions, and (iii) using artificial intelligence to track user gambling habits to increase use of the apps, amongst other features that were designed and implemented to increase user engagement.

135. Defendants' unfair and deceptive conduct also created the likelihood that Plaintiff would not reasonably be able to understand the risk of compulsive gambling that could result in addiction through exposure to the apps, and Defendants' features were designed to create this exact user exposure.

136. Plaintiff justifiably relied on Defendants to not create and implement their Apps with features that would result in a sports betting product that could cause Plaintiff to become addicted and suffer loss and injuries.

137. Plaintiff also justifiably relied on Defendants to not unreasonably expose him to the possibility of addiction through the Apps' features, such as the constant streams of personalized betting opportunities, frequent notifications, and or promotional offers that increased Plaintiff's exposure to the Apps, the number of bets Plaintiff made, the risk that Plaintiff would become addicted, and the amount of financial loss and harm that could and did follow.

138. Defendants' unfair and deceptive trade practices and conduct were a direct and proximate cause of and a substantial factor in the physical harm that Plaintiff suffered, including his gambling addiction, depression, anxiety, and related symptoms.

139. Additionally, Defendants' unfair and deceptive practices and conduct were a direct and proximate cause and substantial factor in Plaintiff suffering ascertainable financial loss from the repeated and addictive betting through the Sportsbook/Casino Apps. But for the Defendants' unfair and deceptive practices and conduct, Plaintiff would not have bet as frequently on the Sportsbook/Casino Apps, and therefore would not have suffered the resulting and current financial loss.



Case ID: 260702927

## EQUITABLE TOLLING OF STATUTE OF LIMITATIONS

140. Additionally, Defendants' unfair and deceptive practices and conduct were a direct and proximate cause and substantial factor in Plaintiff suffering financial loss from the repeated and addictive betting through the app. But for the Defendants' unfair and deceptive practices and conduct, Plaintiff would not have bet as frequently on the app and therefore would not have suffered the resulting and current financial loss.

141. Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

142. Defendants willfully, wantonly, and intentionally withheld information from Plaintiff and the general public concerning the known dangers associated with the use of their sports gambling apps. Due to the absence of any warning by the Defendants regarding the significant addiction risk associated with their sports gambling products, Plaintiff was unaware that his use of the platforms would lead to his addiction and further economic and mental injuries.

143. To the extent that Defendant(s) may claim that one or more of Plaintiff's claims are barred by the applicable statute of limitations, Plaintiff asserts that the statute of limitations is and has been tolled by Plaintiff's discovery that the injuries were caused by Defendants' defective products and failure to properly and adequately warn of the products' risks, all as more fully set forth in this Complaint, after the injuries sustained by Plaintiff.

## PRAYER FOR RELIEF

144. WHEREFORE, Plaintiff requests judgment against Defendants for compensatory damages for all injuries and losses recoverable under law, including but not limited to:

a. CHRISTOPHER EVANS' gambling losses incurred on the DraftKings app;



Case ID: 260702927

b. CHRISTOPHER EVANS' physical harm, including his development of a gambling addiction disorder and additional mental health conditions, suffered as a result of using DraftKings' online gambling platforms;

c. CHRISTOPHER EVANS' pain and suffering;

d. CHRISTOPHER EVANS' lost earnings;

e. All recoverable costs of this action; all legally recoverable interest; and

f. Any other relief the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully demands a trial by jury of all claims so triable.

Dated: July 24, 2026

Respectfully Submitted,

*/s/ Francesca K. Burne*
Francesca K. Burne (P.A. Bar No.: 324523)
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
Email: fburne@awkolaw.com

Jennifer M. Hoekstra
*pro hac vice forthcoming*
W. Eric Stracener
*pro hac vice forthcoming*
**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ PLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
Email: jhoekstra@awkolaw.com
estracener@awkolaw.com

*Attorneys for Plaintiff*

Filed and Attested by the
Office of Judicial Records
04 SEP 2026 04:43 pm
N. HATCHER

**COZEN O'CONNOR**
Dexter R. Hamilton (Atty I.D. #50225)
Matthew A. Glazer (Atty I.D. #204540)
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-2000
dhamilton@cozen.com
mglazer@cozen.com

*Attorneys for Defendants, DraftKings Inc. and Crown PA Gaming LLC (erroneously sued as Crown PA Gaming Inc.)*

| | |
|---|---|
| CHRISTOPHER EVANS,<br>Plaintiff,<br>v.<br>DRAFTKINGS INC., *et al.*,<br>Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>JULY TERM 2026<br>NO. 02927 |

**ENTRY OF APPEARANCE**

TO THE PROTHONOTARY:

Please enter the appearance of Matthew A. Glazer and Dexter R. Hamilton on behalf of *Defendants, DraftKings Inc. and Crown PA Gaming LLC (erroneously sued as Crown PA Gaming Inc.)* regarding the above matter.

COZEN O'CONNOR

*/s/ Matthew A. Glazer*
Matthew A. Glazer (Atty I.D. #204540)
Dexter R. Hamilton (Atty I.D. #50225)
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Telephone: (215) 665-2000
dhamilton@cozen.com
mglazer@cozen.com

Richard R. Patch*
Clifford E. Yin*
Laura Seegal*
David Beach*
COBLENTZ PATCH DUFFY & BASS LLP
One Montgomery Street, Suite 3000
San Francisco, California 94104
Telephone: (415) 391-4800
ef-rrp@cpdb.com
ef-cey@cpdb.com
ef-lrs@cpdb.com
ef-dcb@cpdb.com

Steven N. Geise*
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone: (858) 314-1170
sngeise@jonesday.com

Emily C. Baker*
JONES DAY
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-8466
ecbaker@jonesday.com

Michael S. Quinlan*
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-1368
msquinlan@jonesday.com

*Pro Hac Vice Application Forthcoming

*Attorneys for Defendants, DraftKings Inc. and Crown PA Gaming LLC (erroneously sued as Crown PA Gaming Inc.)*

Dated: September 4, 2026



Case ID: 260702927

## CERTIFICATE OF SERVICE

I, Matthew A. Glazer certify that a true and correct copy of the foregoing Entry of Appearance was served via the Court's ECF system on all counsel of record.

By: */s/ Matthew A. Glazer*
Matthew A. Glazer

Filed and Attested by the
Office of Judicial Records
08 SEP 2026 11:37 am
G. IMPERATO

| | |
|---|---|
| CHRISTOPHER EVANS,<br>Plaintiff,<br>v.<br>DRAFTKINGS INC., *et al.*,<br>Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>JULY TERM 2026<br><br>NO. 02927 |

## STIPULATION

AND NOW, this _____ day of _____________ 2026, Plaintiff, Christopher Evans, and Defendants, DraftKings Inc., and Crown PA Gaming LLC (erroneously sued as Crown PA Gaming Inc.) (collectively, "Defendants" and together with Plaintiff, the "Parties"), hereby jointly stipulate to and respectfully request that the Court adopt the following responsive pleading schedule.

1. Plaintiff filed his Complaint on July 24, 2026.
2. Defendants accepted service of the Complaint on August 19, 2026.
3. The Parties agree and respectfully request that the deadline for Defendants to respond to Plaintiff's Complaint be extended to **September 18, 2026.**
4. To the extent that any Defendants' initial responsive pleading is a Motion, Petition, or Preliminary Objections rather than an Answer, the Parties agree and respectfully request that the deadline for Plaintiff to file any opposition be extended to **October 23, 2026** and that the deadline for Defendants to file any reply will be **November 13, 2026**.
5. Nothing in this Stipulation shall constitute a waiver of, or prejudice to, any rights, defenses, objections, or arguments available to any party, all of which are expressly preserved.

It is so Stipulated and Agreed by the Parties:

Dated September 8, 2026

AYLSTOCK, WITKIN, KREIS
& OVERHOLTZ PLC

*/s/ Francesa K. Burne*
Francesca K. Burne (PA ID No. 324523)
Jennifer M. Hoekstra*
W. Eric Stracener*
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
fburne@awkolaw.com
jhoekstra@awkolaw.com
estracener@awkolaw.com

**pro hac vice* motions forthcoming

*Attorneys for Plaintiff, Christopher Evans*

COZEN O'CONNOR

*/s/ Matthew A. Glazer*
Matthew A. Glazer (PA ID No. 204540)
Dexter R. Hamilton (PA ID No. 50225)
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Telephone: (215) 665-2000
mglazer@cozen.com
dhamilton@cozen.com

COBLENTZ PATCH DUFFY & BASS LLP
Richard R. Patch*
Clifford E. Yin*
Laura Seegal*
David Beach*
One Montgomery Street, Suite 3000
San Francisco, California 94104
Telephone: (415) 391-4800
ef-rrp@cpdb.com
ef-cey@cpdb.com
ef-lrs@cpdb.com
ef-dcb@cpdb.com

JONES DAY
Steven N. Geise*
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone: (858) 314-1170
sngeise@jonesday.com

Emily C. Baker*
1420 Peachtree Street, N.E., Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-8466
ecbaker@jonesday.com

Michael S. Quinlan*
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-1368
msquinlan@jonesday.com

**pro hac vice* motions forthcoming

*Attorneys for Defendants, DraftKings Inc. and Crown PA Gaming LLC (erroneously sued as Crown PA Gaming Inc.)*

IT IS SO ORDERED this ______ day of ___________________________, 2026.

**BY THE COURT:**

____________________________________
J.



Case ID: 260702927

**CERTIFICATE OF SERVICE**

I, Matthew A. Glazer, hereby certify that on September 8, 2026, I served a true and correct copy of the foregoing Stipulation via the Court's e-filing system and electronic mail as follows:

Francesca K. Burne
Jennifer M. Hoekstra
W. Eric Stracener
Aylstock, Witkin, Kreis & Overholtz PLC
17 E. Main Street, Suite 200
Pensacola, FL 32502
fburne@awkolaw.com
jhoekstra@awkolaw.com
estracener@awkolaw.com
*Attorneys for Plaintiff*

By: */s/ Matthew A. Glazer*
Matthew A. Glazer

*Attorneys for Defendants, DraftKings Inc. and Crown PA Gaming LLC (erroneously sued as Crown PA Gaming Inc.)*